IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION


*******

ALLIANCE FOR THE WILD ROCKIES,                    CV 08-11-H-CCL
and NATIVE ECOSYSTEMS COUNCIL,

     Plaintiffs,

                                        OPINION & ORDER

-v-

TOM TIDWELL, WILLIAM AVEY, and
UNITED STATES FOREST SERVICE,

     Defendants.

*******

The parties present this case for judicial review pursuant to the

Administrative Procedures Act.  The decision to be reviewed is a final

administrative decision (the "Decision Memo," of July, 2007) of  Defendant

William Avey (the "District Ranger") of the Big Timber Ranger District, Gallatin

National Forest ("GNF"), which is part of the Defendant United States Forest

Service ("USFS").  Defendant Thomas Tidwell is the Regional Forester for Region

One of the United States Forest Service.

The parties' cross-motions for Summary Judgment came on for hearing on

April 17, 2009.  Timothy Bechtold argued for Plaintiffs, and AUSA Mark Steger

Smith argued for Defendants.  The Court, having heard the arguments of the

parties and having considered and reviewed their cross-motions, briefs, and the

entire administrative record, is prepared to rule.

The Court must decide whether the U.S. Forest Service met all substantive

and procedural requirements prior to deciding to conduct a sanitation harvest

primarily of diseased, dead, or dying Douglas-fir trees, for the purpose of trying to

save the remaining forest from an epidemic of the Douglas-fir beetle.  After

subjecting the entire matter to *de novo* review, the Court concludes that this

sanitation harvest was properly planned and has met all legal requirements.

A.      BACKGROUND:

The Defendant Avey's Decision Memo[1] describes the Big Timber Canyon

Vegetation Treatment Project (the "Project").  (A.R. 1-13.)  Located in Timber

Compartments 104 and 105 of the Big Timber Ranger District, the Project consists

of removing Douglas-fir bark beetle infested trees and thinning trees on 180 acres

---

[1]  This Decision Memo was released in July, 2007.  The original Decision
Memo was released in February, 2007.  The original memo was revised in
response to the Plaintiffs' administrative appeals because the Forest Service
believed that "additional soils analysis was needed to clearly show compliance
with Regional Soil Standard Guidelines."  A.R. 1-13 at 20.

(known as "Unit 1" and "Unit 2") of partially forested land in the Big Timber Canyon on the east side of the Crazy Mountains.  Units 1 and 2 are infected with the Douglas-Fir bark beetle.  Unit 1 contains a northern goshawk bird's nest; the Northern Goshawk is neither a threatened nor sensitive species but is a management indicator species for old growth forest.

The primary purpose of the Project is to control the spread of the Douglas-Fir bark beetle by removing infested trees and thinning densely forested land to leave approximately 80-100 basal[2] area per acre (approximately 40 to 100 trees per acre), which according to the Forest Service's Regional Entomologist is the optimal density for prevention of an epidemic level of the beetles.  (A.R. 2-1 at 1.) At this optimal density, the remaining trees are expected to be vigorous enough to withstand the bark beetle infestation, thereby controlling further spread of the infestation.

The Analysis Area consists of Timber Compartments 104 and 105; it is approximately 26,500 acres of land including and surrounding the Project site, and the Analysis Area ranges in elevation from 5,700 to 10,600 feet, with an average slope of approximately 30-50 percent.  (A.R. 5-4 at 1.)  The Analysis Area consists

---

[2] "Basal area is the area of a cross section of a tree measured at diameter breast height and is a measure of density."  A.R. 13-23 at 29.

of 40% forested land.  (A.R. 5-4 at 2.)  There is no wilderness area within the Analysis Area.  A.R. 1-13 at 19.  There are no inventoried roadless areas within the project area.  A.R. 1-13 at 20.  The Analysis Area is unique in that it consists of a checkerboard of public and private land.

There have been few past timber harvests in Compartment 104 of the 26,500 acre Analysis Area.  In the 1980s, approximately 50 acres were regeneration harvested, and another 50 acres were shelterwood harvested on National Forest System Lands ("NFS").   AR 1-13 at 6.  On private lands in the Project Area, 150 acres were "regeneration harvested" in the 1960s, 70 acres in the 1980s, and 20 acres in the 1990s.  In addition, shelterwood harvesting occurred on 90 acres in the 1980s, and 50 acres in the 1990s.

In Compartment 105, there have been no timber harvests on Forest Service lands.  Private lands within Compartment 105 have seen some harvesting: there was 300 acres of regeneration harvesting in the 1980s.

This amounts to some 780 acres of public and private timber harvesting in the past 50 years, or roughly 3% of the Analysis Area.  No other foreseeable harvesting activities are planned in the Analysis Area.

Approximately 26% (Timber Compartment 104) to 30% (Timber Compartment 105) of the timbered Analysis Area consists of old growth forest.

(A.R. 5-4 at 2.)  The GNF Forest Plan requires at least 10% old growth by timbered compartment, so both of the Timber Stand Compartments (104 and 105) are well above the 10% standard.  (A.R. 5-4 at 2.)  The Project calls for thinning of approximately 25 acres out of 1,500 acres (less than .02%) of old growth forest in Compartment 104.


**B.    LEGAL STANDARD:**

   a.    Summary Judgment Standard

   Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  However, the parties do not present factual disputes for resolution in this case; instead, the parties present issues based upon an administrative record which relate to the legality of the agency's final decision and proposed action.

   b.    Standard of APA Review

   The APA governs judicial review of decisions made under NEPA and NFMA.  *Ecology Center v. Castaneda*, 562 F.3d 986, 989 (9th Cir. 2009).  A reviewing court may set aside agency actions when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).   Reversal is appropriate "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (quoting *Earth Island Inst. II v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006) (internal citation omitted)).


## C.    DISCUSSION

Typically, NEPA requires extensive project preparation and documentation, usually in the format of an Environmental Assessment, sometimes followed by preparation of an Environmental Impact Statement.  *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4(a)-(c).    In this project, the FS prepared a Biological Evaluation that addressed the effects the project might have on the Grizzly Bear, the Canada Lynx, the Grey Wolf, and the Bald Eagle.  A.R. 5-4.  The U.S. Fish and Wildlife Service submitted a concurrence letter that agrees with the FS that these threatened and endangered species will suffer no likely adverse effect due to the project or be otherwise jeopardized by the project.  A.R. 5-8.

The FS did not proceed to conduct lengthier preparations, such as an EA

and EIS, because it claims a Categorical Exclusion ("CE").  A CE relieves a

federal agency of the duty to prepare an EA or EIS and is available for certain

categories of projects when the agency has determined that an entire category of

action, either individually or cumulatively, has no significant effect on the human

environment.  40 C.F.R. § 1508.4.  The Forest Service Decision Memo claims that

a CE applies to this project because it falls within the category of a "sanitation

harvest" designed to control insects or diseases on less than 250 acres, and

requiring only ½ mile or less of temporary road construction.  A.R. 1-13 at 17.

The Decision Memo also claims that no extraordinary circumstances are related to

the Project.  AR 1-13 at 18-20.  No sensitive, threatened, or endangered species

are found within the project area.  A.R. 1-13 at 18.  The Project is not located

within a riparian area.[3]  A.R. 1-13 at 19.  No Native American religious or cultural

sites have been found in the Analysis Area, and no comments were received from

tribal members or organizations.  A.R. 1-13 at 20.

Plaintiffs appear to agree that the CE is appropriate for the project, but they

assert that all of other issues presented by them constitute extraordinary

---

[3]   However, one access point to the project area does cross the Big Timber
Creek.  The Forest Service asserts that the harvest activities would cause only a
small increase in sediment yield (1.1%) in the Big Timber Creek, and that increase
would be normalized within 4 years with treatment, well within the guidelines
established for GNF streams.  A.R. 1-13 at 19.

circumstances related to the project that should preclude categorical exclusion from NEPA documentation requirements.  Extraordinary circumstances are those "in which a normally excluded action may have significant environmental effect." 40 C.F.R. § 1508.4.  If an extraordinary circumstance is discovered during the scoping process, then the agency conducts an Environmental Assessment.  If no extraordinary circumstance is discovered, the agency must still provide "a convincing statement of reasons why potential effects are insignificant." *Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir. 1985).

   1.  Project Impact on Soil.

         a.  Soils analysis by watershed.  Plaintiffs complain that the methodology utilized by the FS to study the project's impact on soils is too limited because it focused on the analysis area instead of the entire watershed, or drainage, within which the project is sited.[4]  It is FS practice to study soils according to Region 1 Soil Quality Standards (the "R1SQS"), and the method and standard utilized by the FS is to allow detrimental soil disturbance up to 15 percent of the activity area (which is the harvest unit).  Thus, the FS focuses on soil disturbance

-----

[4]  This soils issue should be distinguished from the issue of the cumulative impacts to the watershed from project activities, which the FS did analyze.  A.R. 8-1 at 3.  The FS concluded that cumulative impacts on the watershed would be *de minimis*, and well within the guideline limitations of the GNF Plan.  A.R. 8-1 at 3-4.

within the activity area, not any watershed within which the activity area may be located.  Plaintiffs argue that the study should encompass the entire watershed, and Plaintiffs rely on a statement contained in a "Review of Soil Productivity Monitoring Methods and Trends" paper prepared by the FS Region One Soils Monitoring Task Group in 2000 (the "Kuennen 2000 Report").  *See* A.R. 13-33. The Region 1 Soil Quality Standards provides the standards and analytical method for soils studies that has been developed by FS scientists and is currently in use. The R1SQS is the foundation for the Kuennen 2000 Report, but that report also contains a statement indicating that there is some concern (presumably among soils specialists) for the "cumulative effects on watershed health" when numerous activities (i.e., timber harvests") occur over time in "*at least some* watersheds." A.R. 13-33 at 6 (emphasis added).  However, at this point in time, the landscape scale suggestion contained in the Kuennen 2000 Report is not the formal landscape scale used by the FS in studying impacts on soils and, significantly, the Report provides no standards to be met if one were to use the watershed scale. The Kuennen 2000 Report is a seven page, informal paper that contains one among many suggestions for future direction of study and analysis.  It does not contain meaningful standards or a fully developed, formal method of soils analysis in a watershed that could have been applied during the FS' preparation for the Big

Timber Canyon Vegetation Treatment Project.

"Agencies have 'discretion to determine the physical scope used for measuring environmental impacts' so long as they do not act arbitrarily and their 'choice of analysis scale . . . represent[s] a reasoned decision.'" *Wildwest Institute v. Bull*, 547 F.3d 1162, 1173 (9th Cir. 2008) (*quoting Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002)).  Obviously, the reason the agency chose the activity area scale is because that is the established practice of the agency under the R1SQS standards.  The Project is not located in a riparian area, and the minor impact to the Big Timber Creek, where equipment must cross the Creek, is expected to be minimal and amenable to treatment.  There is no indication at all that this is one of the watersheds of concern to the authors of the Kuennen 2000 Report.  Therefore, the FS was not arbitrary and capricious and did not commit a clear error in judgment by following the established procedure under R1SQS of using the standard that allows detrimental soil disturbance of up to 15 percent of the activity area.

Moreover, Plaintiffs did not exhaust the soils/watershed argument at the administrative level, and this is the reason that we do not have a more complete statement from the FS as to why it chose the physical scope of activity area versus watershed in evaluating soil disturbance.  During their administrative appeal,

Plaintiffs did not bring the *Kuennen* 2000 paper to the attention of the FS or comment that the Decision Memo lacked an analysis of soils disturbance at the watershed level.  Plaintiffs should not now present the *Kuennen* 2000 Report at the level of judicial review and attempt to prove that *it* is the best available science, not the science performed by and relied upon by the FS scientists.  It was Plaintiffs' responsibility to participate in the administrative process in a meaningful way and to alert the FS to their position and contentions.  *See Vt.. Yankee Nuclear Power Corp. v. Natural Res. Defense Council*, 435 U.S. 519, 553 (1978); *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991).  Because this small-scale sanitation harvest is not within a riparian area and because there are no watershed problems, at least that Plaintiffs have pointed out, the watershed issue is not an obvious issue.  There is no evidence that the FS had independent knowledge of the issue and ignored that knowledge.

Taking the contrary position, Plaintiffs argue that it was the Forest Service's own scientists who raised this issue in the Kuennen 2000 Report, so the Forest Service did in fact have independent knowledge of the issue.  This is not fair for two reasons: (1) the Kuennen 2000 Report only contains a brief suggestion of a concern, not a well-developed analytical protocol and meaningful standards for evaluation of soil disturbances at the watershed level, and (2) the Kuennen 2000

Report is not in any way directed toward or particularly relevant to this Project or this Analysis Area.  Furthermore, FS scientists need to have the freedom to generate written reports to communicate possible ideas for further study without having those ideas immediately take on the mantle of "best available science" (which is clearly not yet warranted) and be used to justify reversal of FS decisions.  One potential result of treating such nascent ideas as mandates is that it might restrict or discourage open scientific discussion within the agency.

This is the type of situation forbidden by *Havasupai*:  the failure to raise the issue during the administrative process precluded the agency from addressing it, and allowing the plaintiff to raise the issue on appeal places the agency at an unfair disadvantage.  As was the case in *Havasupai*, Plaintiffs "had some obligation to raise these issues during the comment process."  *Havasupai*, 943 F.2d at 34.  No exceptional circumstances justify raising the soils/watershed issue for the first time in the district court.

b.  Violation of 15% soil disturbance guideline.  Plaintiffs complain that the Project will violate the GNF Plan guideline for no more than 15% soil disturbance.  According to Plaintiffs, the soil quality monitoring report in the record shows that every logging unit violated the regional standard.  A.R. 13-8.

The soils report cited by Plaintiffs shows that research in the field in the

1990s revealed that logging practices were not resulting in observation of the 15%
soils disturbance guideline in the GNF Plan.  New methods of conducting timber
harvests were implemented to try to reduce soils disturbance.  The Shovic 2005
soils report showed that while improvements in methods had been made and soils
disturbance was being reduced, timber harvesting was still resulting in violation of
the 15% soils disturbance guideline.  A.R. 13-8 at 16.  The Shovic report indicates
that the use of low ground pressure off-trail vehicles was not enough to bring the
timber harvests into compliance with the GNF Plan.  As a result, in 2002 the GNF
guidelines were changed to "restrict[] ANY off-trail ground disturbing activities,
unless the ground is snow-covered, frozen, or covered with a protective layer of
slash.... Theoretically, this should eliminate the off-trail contribution to
detrimental disturbance."  A.R. 13-8 at 16.   Thus, the Shovic report shows
continuing monitoring and improvement of FS harvest methods vis-a-vis soils
disturbance.

In this case, soils disturbance on this small 180 acre thinning project is
much less an issue than it might normally be due to the fact that at approximately
116 acres of Unit 1 will be harvested by helicopter, which drastically reduces
detrimental soils disturbance by removing machine contact with soils.  A.R. 1-13
at 12.  Thus, the majority of acres will have a lower than normal percentage of

soils disturbance.  More recent studies of timber harvests within Region One using best management practices show much improvement in detrimental soil disturbance.  *Id.* (citing studies by Farley (2005), Dumrose (2006), Svoboda (2007), and Shovic (2005)).  In fact, the soils specialist report predicts a detrimental soils disturbance of approximately 4.7% on Unit 1, and approximately 15% on Unit 2, both within the GNF Plan soils disturbance guideline.  A.R. 8-5 at 6.  Use of winter harvesting option would reduce the soils disturbance even further.  Plaintiffs soil disturbance claim is therefore without merit.

2.  Harvest in unroaded areas.

Plaintiffs argue that Defendants have not carefully assessed the value of the harvest areas in that they are unroaded areas.  Plaintiffs assert that these harvest areas are unroaded areas contiguous to roadless areas.  Roadless areas are significant "because of their potential for designation as wilderness areas under the Wilderness Act of 1964, 16 U.S.C. § 1131-1136."  *Lands Council v. Martin*, 529 F.3d 1219, 1230 (9th Cir. 2008).  The Forest Service Handbook includes inventoried roadless areas among the conditions that should be considered to determine whether there are "extraordinary circumstances" that would preclude a categorical exclusion.  A.R. 15-5 at 3.  Plaintiffs cite *Smith v. Forest Service*, 33 F.3d 1072 (9th Cir. 1994), for the proposition that "the decision to harvest timber

14

on a previously undeveloped tract of land is 'an irreversible and irretrievable decision' which could have 'serious environment consequences.'" *Id.* at 1078 (*quoting National Audubon Soc'y v. United States Forest Serv.*, 4 F.3d 832, 842 (9th Cir. 1993)).

Defendants respond that neither harvest unit is "unroaded," only Unit 1 touches a roadless boundary at one discrete point, and neither harvest unit is contiguous with a roadless area. (Doc. 29 at 6; *see also* Doc. 29-3 at 1.) Unit 2 is not adjacent to a roadless area. Unit 1 touches the roadless area at a chokepoint and is not contiguous with the roadless area. Unit 1, which is surrounded by private land on all sides, has a logging road running through it and contains previously thinned areas and prior clear cuts. A.R. 9-1 at 3. Unit 2 is adjacent to a Forest Service campground and its access road. In general, the harvest areas are comprised of a checkerboard of public and private land. The FS claims that even if these were unroaded areas (which they are not), that fact would not constitute an extraordinary circumstance that would trigger preparation of an EA. *See* A.R. 15-5 (FSH § 1909.15(30.3) (listing examples of extraordinary circumstances, but not including "unroaded areas").

This Court agrees that the harvest units are not "unroaded." Furthermore, the FS has considered the wilderness values of any unroaded areas in evaluating

15

the project.  For example, the Decision Memo notes that "[t]he project area is not located in an inventoried roadless area.  The vast majority of the Crazy Mountains, located on the Big Timber Ranger District, are within the Crazy Mountain Roadless Area No. 1-541.  No Wilderness designation exists in the Crazies.  The Forest recognizes the outstanding scenic quality of the Crazy Mountains."  A.R. 1-13 at 5.

Importantly, the size of the harvest units and the public-private checkboarding cause them to fail to meet the criteria provided by the Wilderness Act for a "sufficient size as to make practicable [the tracts'] preservation and use in an unimpaired condition."  16 U.S.C. § 1131(c).  In *Smith*, the tract of land at issue was more than 5,000 acres.  In *Lands Council v. Martin*, one tract of land at issue was 4,284 acres and the other tract of land was more than 13,000 acres.  The tracts of land at issue in this case (25 acres and 155 acres, for 180 acres total) are not roadless, but even if they were it is apparent that they are not of sufficient size to make practicable their preservation and use in an unimpaired condition.  There is no potential for a wilderness designation, and Plaintiffs' claim for an extraordinary circumstance precluding categorical exclusion is without merit.

    3.  Project Impact on Northern Goshawk.

        a.  Loss of Sensitive Species Status.  In the Decision Memo, the

Forest Service notes that the Northern Goshawk is no longer a sensitive species (although it remains a Management Indicator Species ("MIS") for old growth forest), having been taken off the sensitive species list in Region 1 on July 17, 2007.  A.R. 1-13 at 23.  When the Northern Goshawk was added to the sensitive species list in 2005, the FS then acknowledged that the sensitive ranking was perhaps not warranted.  A.R. 5-9 at 2.  After the ranking, Fred Samson's scientific paper[5] in 2006 and a 2005 Region 1 inventory[6] "demonstrated that (1) habitat

---

[5]  "A Conservation Assessment of the Northern Goshawk, Black-backed Woodpecker, Flammulated Owl, and Pileated Woodpecker in the Northern Region."  Unpublished Report on File.  USDA Forest Service.  Missoula, MT.  2006.  Samson. F.B.  A.R. 13-23.  Dr. Samson is a Regional Wildlife Ecologist with the Northern Region of the Forest Service.  He concludes in his paper that "a single goshawk population exists in the Northern Region and habitat is well distributed by National Forest."  A.R. 13-23 at 36.  He further concludes that "[n]o evidence exists that the northern goshawk is declining in numbers in the western United States."  A.R. 13-23 at 37 (citation omitted).  Looking at all the criteria underlying short-term viability, Dr. Samson also concluded that the Northern Goshawk has no issue as to short-term viability.  A.R. 13-23 at 38.

[6]  "Draft Survey of the Frequency of Northern Goshawk Presence in the Northern Region During 2005.  2005a.  USDA Forest Service Region One, Missoula, MT.  A.R. 13-27.  This document presents the results of a single-year survey of the frequency of goshawk presence in non-Wilderness and non-Roadless portions of the National Forest in the Northern Region.  The survey used "the acoustical broadcast calling technique developed by Kennedy and Stahlecker (1993)."  A.R. 13-27 at 4.  Consistent with Clough (2000), this survey found "that during the nest period goshawks were fairly common and widely distributed in the roaded (or more managed) portions of NFS lands in Region 1."  A.R. 13-27 at 7.  The survey found goshawks "from the Idaho Panhandle and Nez Perce National Forests in the western part of the Region to the Custer and Lewis and Clark

exists to support reproductive individuals on each Forest; (2) habitat is well

distributed; and (3) individual goshawks can interact with one another across the

Region." A.R. 5-9 at 2. Thus, the FS, citing the Forest Service Manual (2670.5),

determined that the Northern Goshawk did not meet the definition of a Sensitive

Species because it did not have a downward trend in population numbers or

density or a downward trend in habitat capability. A.R. 5-9 at 2.

Plaintiffs argue that the FS inappropriately removed the Sensitive Species

status from the Northern Goshawk in 2007, possibly timing the removal for the

purpose of initiating this project. The evidence does not support Plaintiffs' theory.

In fact, it appears that the Sensitive Species status was itself questionable from the

very beginning, and post-listing research proved that the listing was inappropriate

and unnecessary. The decision to remove the Northern Goshawk from the

Sensitive Species list is justified by the scientific evidence presented by

Defendants in the administrative record.

Next, Plaintiffs argue that Defendants failed to use the best available

science in studying the effects of the project on the Northern Goshawk. Plaintiffs

argue that Defendants have failed to use the best available science as to the

requisite percentage of canopy covering for goshawk habitat; the requisite number

_____

National Forests in central Montana." A.R. 13-27 at 8.

of nesting site buffer zones; and the requisite size of the nesting buffer zone.

b.  Loss of Canopy Coverage.  Plaintiffs argue that goshawks require 69% canopy covering and this Project only retains 37% canopy cover. Defendants position is that the 37% canopy cover retained in Douglas Fir > 12" in diameter in the Post-fledging Family Area (" PFA") is well within the range identified by Clough.  A.R. 5-4 at 9.  Further, the PFA itself will have a total 59% canopy cover, A.R. 5-4 at 10, Table 4 (22% Douglas fir & Mixed Conifer > 5" and 37% Douglas Fir > 12", for a total of 59% canopy cover), well within the recommendations of Reynolds (1992), A.R. 13-9 at 14.[7]

c.  Failure to Providing Adequate Nesting Areas.  Plaintiffs assert that the Project fails to retain six nesting areas as is required by Reynolds (1982). However, this misreads Reynolds, which states that the goshawk *may* have more than one nest, A.R. 13-9 at 3, and that the goshawk generally retains two to four alternate nesting sites in a 5,000 acre home range, A.R. 13-9 at 13.  One of the nests is used from year to year, and apparently this use of primary and alternate nests insures against catastrophic loss or natural decline of any particular nest.

_____

[7] [F]orests in the PFAs should contain overstories with a canopy cover greater than 50%...."  A.R. 13-9 at 14.

A.R. 13-9 at 13.[8]

In this case, the FS has discovered one nest site within the activity area, and that nest site will be protected by a 40-acre no activity buffer. Two alternate nest sites have been discovered outside of the activity area, south of Big Timber Creek, A.R. 54-6, and they obviously require no buffer as part of this Project because they are not within the activity area. The FS will place a 40-acre no activity buffer around any new nest sites that it discovers in the Analysis Area. A.R. 1-13 at 15. The Forest Service asserts that there is an abundance of nesting habitat within 1-3 miles of the project area. A.R. 1-13 at 18. The Biological Evaluation conducted by the FS concludes that there are 5,000 acres of suitable goshawk nesting habitat out of the 26,500 acre Analysis Area. A.R. 5-4 at 8, Table 3. Indeed, there may be six nest sites, but perhaps only one nest site is actually located within the Analysis Area. It is reasonable for the FS to provide a buffer zone for the only goshawk nest that it can find in the Activity Area (and it has looked for more, *see* A.R. 1-13 at 14)), especially since there is abundant goshawk habitat in the Northern Region and because there is no evidence that either goshawk numbers or goshawk habitat

---

[8] "Management Recommendations for the Northern Goshawk in the Southwestern United States." USDA Forest Service General Technical Report RM-217. 1992. Reynolds, R.T., R.T. Graham, M.H. Reiser, R.L. Bassett, P.L. Kennedy, D.A. Boyce Jr., G. Goodwin, R. Smith, and E.L. Fisher.

is trending downward.[9]  Not only is there no evidence that goshawk numbers are

trending downward, there is evidence in the administrative record that tends to

show that "timber harvest [has] no effect on breeding area occupancy, nest

success, or productivity 1 to 2 years after timber harvest."  A.R. 13-23 at 37

(Samson (2006) citing Moser and Garton (2004)).  This finding has been

corroborated by studies of goshawks in Europe.  Samson (2006) reports that

> Penteriani and Faivre (2001) reported similar findings to Moser and
> Garton (2004).  Their study in central Italy and eastern France (the
> northern goshawk is widely distributed in Europe) found no
> difference in the productivity of northern goshawk pairs reproducing
> in logged versus unlogged areas.

A.R. 13-23 at 37.  Thus, the FS decision to protect the only nesting area that it can

find within the project area is a reasonable one, given that no other nest can be

found, that the goshawk is not threatened, endangered, or sensitive, and that the

goshawk's nest success is unlikely to be diminished by this thinning project.

> d.  Inadequate Buffer Zone Around Nest.  Plaintiffs also argue that a

40 acre no-activity buffer is inadequate, citing Reynolds (1992).  Doc. 24 at 10.

However, in 1992, Reynolds recommended a 30-acre buffer.  A.R. 13-9 at 3.

---

[9]  "Habitat is abundant for the northern goshawk in the Northern Region and
by Ecological Province and by National Forest."  A.R. 13-23 at 37.  "No evidence
exists that the northern goshawk is declining in numbers in the western United
States (Kennedy 1997)."  A.R. 13-23 at 37.

21

Reynolds goes on to recommend that "[t]hree suitable nest areas should be maintained per home range [a home range being approximately 6,000 acres]." A.R. 13-9 at 6.  However, nowhere does Reynolds require the FS to create or maintain the nests in the first instance.  Either they are present or they are not, and either they are found or they are not found.  Reynolds merely recommends that a nest be given a 30-acre buffer zone.  Moreover, as recently as 2006, scientists Squires and Kennedy claimed that Reynolds (1992) recommendations "still remain as an untested hypothesis."  A.R. 13-31b at 8.  These authors conclude that

> Goshawk biologists generally agree that goshawk management requires providing suitable nest stands and a large landscape for foraging.  However, the need for managing intermediate scales (e.g., PFA) and very small scales (the nest site) is still open to debate.

*Id.*  Some biologists believe that the better plan is to "focus on managing large forest tracts as sustainable ecological units" rather than creating guidelines for a single species such as the goshawk and managing the landscape just for that single species.  *Id.*  In any event, Reynolds et al. (1992) does not require that the FS provide multiple buffer zones to nests that may or may not exist.

The FS determined in its Region One Guidelines that a 40-acre no-activity buffer was appropriate.  A.R. 13-31a at 39.  This 2007 document surveyed the current goshawk research and based the Region One guidelines thereon, including

not only Reynolds et al., but also the studies of Clough (A.R. 13-10), Greenwald (A.R. 13-16), Hillis (A.R. 13-18), McGrath (A.R. 13-20), Patla (A.R. 13-21), Samson (A.R. 13-23), and Squires (A.R. 13-31b).

> e.  Inadequate Post-fledge Period.  The Decision presents the possibility of conducting fall and winter harvest operations in order to eliminate most impacts on wildlife.  A.R. 1-13 at 14.  Winter harvesting also lessen impacts on soils (i.e., less than 7% disturbance).  A.R. 1-13 at 12.  The winter harvest option would minimize activity during the goshawk fledging period.   Whether or not the winter harvest option is chosen, the Decision Memo also calls for a complete hiatus of activity between March 1 and August 15, during the period of goshawk nesting and fledging.  A.R. 1-13 at 14.  Plaintiffs argue that this no-activity period is inadequate and should extend until September 30.

The Defendants defend the post-fledging timing by pointing out that the "Northern Goshawk Northern Region Overview (Final)," USDA, Brewer et al., 2007, study recommends that a post-fledging activity hiatus should be about 30 days long.  A.R. 13-31a at 39.  Specifically, the Brewer (2007) study recommends a nesting-fledging no-activity period from April 15 through August 15.  Within about 30 days after fledging, goshawk young are capable of sustained flight because their "flight feathers fully develop and harden [within] 30 days after

23

fledging off the nest []." *Id.*

Defendants argue that Reynolds (1992) gives a better timing restriction: March 1 through September 30.  A.R. 13-9 at 6.  Clough (2000) found that goshawks generally fledge from the nest between June 29 and July 23.  A.R. 13-10 at 25.  The full post-fledging period may last into October.  A.R. 13-31b at 16 (Brewer 2007) (goshawks may remain in PFA for up to 70-95 days).

However, Defendants are entitled to make scientific judgments among varying opinions, as long as the judgments are reasonably supported by evidence. In this case, Plaintiffs prefer the 1992 judgment of Reynolds et al. as against the 2007 judgment of Brewer et al.  Obviously, the 2007 research is more recent and builds upon the 1992 research of Reynolds et al., and also Brewer's research is devoted to the northern goshawk in the northern region, not in the southwestern region as is Reynolds' 1992 research.  "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *McNair*, 537 F.3d at 1000 (*quoting Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).  By August 15, goshawk fledgings are capable of sustained flight and still have the 40-acre nest buffer zone as a retreat from timber management activities.  In addition, and oddly enough, goshawks are

24

reported to choose nest sites near human activities.  A.R. 13-23 at 38.[10]

The Defendant's choice is supported by research and is a rational choice that does not pose an extraordinary circumstance.  The fact that the Defendants chose a 30-day post-fledging activity hiatus period rather than a 75-day activity hiatus does not, either by itself or cumulatively, present an extraordinary circumstance that should preclude the application of the categorical exclusion for a sanitation harvest.

4.  Snags.

Amendment No. 15 to the GNF Plan calls for at least 30 snags per 10 acres.  A.R. 15-1a at 6.  These snags are to be greater than 18' and greater than 10"dbh.  The Crazy Mountains have about 4.1 snags per acre.  A.R. 1-13 at 10.

Plaintiffs claim that snags within the Project Area will be reduced by about 58% based on research performed in Canada.  Document 28 at 16 (citing A.R. 16-06: B-52).[11]  Defendants respond that the 58% reduction in snags in a thinning

---

[10]  Samson (2006) citing "Spatially Explicit Influences on Northern Goshawk Nesting Habitat in the Interior Pacific Northwest."  Wildlife Society Monograph 154.  2003.  McGrath, M.T., S. Destefano, R.A. Riggs, L.L. Irwin, and G.J. Roloff.

[11]  Plaintiffs cite the 2nd Appeal by Native Ecosystems Council at A.R. 16-6; B-52 references "Sciurid Habitat Relationships in Forests Managed Under Selection and Shelterwood Silviculture in Ontario," J. Wildlife Mgmt.,  Holloway, Gillian L., and J.R. Malcolm.

project in Ontario are not relevant to this particular project because this Project calls for 3 snags per acre within the harvest units. (Document 29 at 14.) Defendants believe that this prescription is easily achievable by leaving at least three dead trees (of which there are many mature trees available due to the attack of the Douglas Fir Beetles) per acre. Defendants are clear that the requisite number of snags, and more, will be left in all of the acres of the harvest units. This Court has no reason to question the genuineness of Defendants' intent nor their ability to leave 3 snags per acre, particularly when the Defendants can simply create the requisite number of snags per acre by topping or girdling selected trees. A.R 1-13 at 34.

5. Old growth.

Plaintiffs complain that Defendants violated the GNF Forest Plan's standard requiring 10 percent old growth timber. The FS argues that the Analysis Area significantly exceeds the 10 percent old growth timber requirement, both before and after the Project.

Of the 180 acres to be thinned, approximately 25 acres are old growth. These 25 acres are contained in Timber Compartment 104, and they constitute less than .02% of the approximately 1500 acres of old growth timber in that Compartment. In addressing the old growth standard, the Decision Memo begins

with the "[t]he Forest Plan [which] states that a[t] least 10 percent of commercial forest land within each timber compartment meet old growth conditions."  A.R. 1-13 at 10.  Currently, the Analysis Area meets this old growth standard, having between 26% and 30% of old growth in its two timber compartments.  *Id.* The Decision Memo concludes that the Analysis Area "will still remain well above Forest Plan old growth requirements after treatments."  *Id.*

The GNF Forest Plan states that

"In order to achieve size and age diversity of vegetation, the Forest will strive to develop the following successional stages in timber compartments containing suitable timber:

| Successional Stage | Minimum % of Area |
|---|---|
| Grass-forb | 10 |
| Seedlings | 10 |
| Saplings | 10 |
| Pole | 10 |
| Mature | 10 |
| Old Growth | 10 |

A.R. 13-1 at II-20.  Plaintiffs claim that this means that the FS must strive to develop 10% of every timbered compartment as old growth.  The FS interprets this to mean that 10% *of the forest* in every timbered compartment should be old growth.  For example, and as the Vegetation Report in the record explains, in many timbered compartments, the majority of the acres are not timber at all.

27

These acres may consist of rocks, scree, natural grass, forbs, and water.  A.R. 6-1 at 3-4.  It is true that the FS calculates percentage of old growth *of the forest*, not the entire timbered compartment: "Forested acres were used instead of total acres in calculating forested successional stages at all scales of analysis because in some areas low amounts of forest lands exist (for example, in compartments 104 and 105 total forested acres comprise only 40% of these areas while rock and scree alone comprise 48% of the total compartment acres, making it nearly impossible to achieve 10% minimum amounts for each forest successional stage type if based on total acres."  A.R. 6-1 at 4.  This justification is both reasonable and rational, and Plaintiffs misunderstand the Forest Plan when they assert that it requires 10% old growth by total acreage rather than by forested acreage.  Plaintiffs complaint in this regard is without merit.

Next, Plaintiffs complain that the FS did not get out and count all the old growth trees in Compartments 104 and 105, and thus the FS has no certain proof that the 10% old growth standard has been or will be met.  Plaintiffs point out that the Timber Stand Management Resource System ("TSMRS") does not report the size of the trees that are being counted as old growth.

It is true that scientific opinion must be backed up by evidence.  *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998).  However, the

administrative record does contain the data that supports the FS opinion that there

is 26-30% old growth forest in Compartments 104 and 105.  A.R. 6-1 through 6-

14.  The forest stands in Compartments 104 and 105 are at least 80%  mature to

old growth.  A.R. 6-1 at 3.  They are located at high elevation (average elev.

7,660), with an average slope of 33-42%.  A.R. 6-1 at 2.  Approximately 40 old

growth stands in Compartment 104 were ground truthed, and a mathematical

regression was used to verify and supplement ArcView database, the TSMRS

database, and the  SILC3 database.  A.R. 6-1 at 2-3.  Thus, it would be incorrect to

say that the FS scientific opinion regarding the percentage of old growth forest is

not supported by data.  While it is true that the FS has not gone out and counted

every old growth tree, it has made a reasonable scientific effort to estimate

accurately the acreage of the old growth forest within the 26,500 acres of

Compartments 104 and 105.

Other issues raised by Plaintiffs have been considered by the Court but are

deemed insubstantial, without merit, and do not warrant further discussion here.

**CONCLUSION**

The Court concludes that Plaintiffs' Amended Complaint is without merit.

The Administrative Record does not support Plaintiffs claim that extraordinary

circumstances preclude application of the categorical exclusion for a sanitation harvest.  The U.S. Forest Service (Gallatin National Forest) observed all substantive and procedural laws in planning to conduct this sanitation harvest, the twin purposes of which are to improve forest health and to prevent the mortality of Douglas-fir trees due to beetle infestation.  The project is quite small.  It will not impact endangered, threatened, or sensitive species.  The Court cannot find any reason why the project ought not go forward.

Accordingly,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Doc. 25) is GRANTED, and Plaintiffs' Motion for Summary Judgment (Doc. 23) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Amended Complaint is DISMISSED.  Let judgment enter.

Done and Dated this 3rd day of June, 2009.

_____
CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE